Daniel W. Bower (ISB #7204)
MORRIS BOWER & HAWS PLLC
12550 W. Explorer Drive, Suite 100
Boise, ID 83713
Telephone:   (208) 345-3333
Facsimile:   (208) 345-4461
dbower@morrisbowerhaws.com

Monte Neil Stewart (ISB # 8129)
WRIGHT MARSH & LEVY
300 S. Fourth St., Suite 701
Las Vegas, NV 89101
Telephone:  (702) 382-4004
monteneilstewart@gmail.com

*Lawyers for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAUL E. JOHNSON, an individual; and PRIME ENTERPRISES, LLC, an Idaho limited liability company, | Case No. |
| Plaintiffs, | |
| vs. | **COMPLAINT**<br>**and**<br>**DEMAND FOR JURY TRIAL** |
| CHRIS LYELL, an individual; BRAD K. HANSEN, an individual; and EQUITABLE ACCEPTANCE CORPORATION, a corporation, | |
| Defendants. | |

## COMPLAINT

For their Complaint against defendants Chris Lyell ("Lyell"), Brad K. Hansen

("Hansen"), and Equitable Acceptance Corporation ("EAC") (collectively "Defendants"),

COMPLAINT AND DEMAND FOR JURY TRIAL – PG. 1

the plaintiffs, Paul E. Johnson ("Paul") and Prime Enterprises, LLC ("Prime") (collectively "Plaintiffs"), allege and pray as follows:

## I. Introduction

1.  Paul is a life-long resident of Ada County and is respected here as a good, honest, and conscientious husband, father, and businessman.

2.  Some years ago, Paul's wife, Alice, was diagnosed with multiple sclerosis of a serious and progressing kind.  Because of Alice's MS, there fell on Paul the heavy burden of caring for her and their four children.  That heavy burden included providing virtually constant physical care for Alice, adequate income to cover her extraordinary medical expenses and the family's normal and necessary expenditures, and parental care to the children.

3.  Because of that heavy burden, by the fall of 2015 Paul was desperate to find a business opportunity into which he could put his hard-earned capital and that would do two things:  one, provide a steady income flow adequate to cover those medical expenses and other necessary family expenditures and, two, operate under the management of other honest and capable persons so as to relieve Paul of the need to devote anything more than a small portion of his time to the company.

4.  In those circumstances and with those objectives, Paul searched where he could for the right business opportunity.  One place he searched was the Internet, where Lyell and Hansen were prowling to lure investors.

5.  Lyell and Hansen, a couple of southern California "businessmen," styled themselves as experienced operators with considerable acumen in the student loan relief industry.  So styled, they created a company, its operations, and its "business opportunity," all of which they then set about to sell.  Their main lure was an on-line ad, and it caught Paul's eye.

6.  Three things asserted in the ad and in Lyell and Hansen's follow-up communications to Paul were particularly appealing to him:  one, that the business operations provided genuine help to folks burdened by student-loan debt; two, that those operations would provide Paul with stacked residual income; and three, that because of the Defendants' on-going involvement, Paul's role in the business operations would be at most "semi-absentee."  Because they learned right away of Paul's family situation and resulting vulnerability, Lyell and Hansen knew that the latter two assertions in particular were alluring to Paul.

7.  In Lyell and Hansen's follow-up communications with Paul, they worked hard and successfully to cultivate his trust in and reliance on them.  They also lied repeatedly and skillfully about the history, nature, operations, and prospects for the business operations, and Paul justifiably relied on their lies.

8.  As a consequence of Lyell and Hansen's trust-engendering but deceitful efforts, Paul through Prime put $850,000 into the business, all of which went to those two.  They kept an ownership interest in the business (known as Manhattan Beach Ventures, LLC, a California limited liability company; "MBV") and also got, in addition to Paul's cash, a

contractual "Earn Out of 10% of Gross Profit for 36 months" (in the words of the on-line ad).

9.  Lyle and Hansen wasted no time using the cash they swindled out of Paul and Prime to live a rather extravagant lifestyle, with home, car, exotic vacation, and other purchases.

10. Lyell and Hansen's greed did not end with taking by fraud Paul's capital.  They sought a way to get cash into the business so they could then loot it; in this endeavor, Lyle and Hansen readily found a willing and corrupt ally in EAC.

11.  EAC had masterminded a scheme to defraud Americans struggling to repay their federal student loan debt, with the scheme requiring for its success the coordinated efforts of both EAC and its many "Dealers."  Lyle, Hansen, and EAC got together to make MBV one of those Dealers, with the purpose and effect of causing EAC money to flow through MBV (where Lyle and Hansen could loot it) and of steering to EAC many MBV-contacted federal student loan borrowers whom EAC could then unlawfully steer into an entirely new loan.  Those three further agreed that, to make their deal even sweeter for EAC, Lyle and Hansen would dupe Paul into giving EAC a "Personal Guaranty" ("Guaranty") covering MBV's "obligations" under the MBV-EAC "Full Recourse Master Dealer Agreement" ("Dealer Agreement").

12.  Lyle and Hansen did just that, engineering a way for Paul to sign the Guaranty without him understanding its nature, scope, and import because of his lack of understanding of the nature, scope, and import of the Dealer Agreement.

13.   As a consequence of the Lyle-Hansen-EAC scheme, MBV received from EAC in the following months over $4 million, whereupon Lyell and Hansen, being utterly shameless and without telling Paul they were doing so, took 10% of those proceeds under the guise of those proceeds constituting "gross profit."

14.   Lyell and Hansen then proceeded to run the business into all kinds of troubles and into the ground, in the process requiring Paul to pay out many hundreds of thousands of dollars more in a futile effort to protect his original investment.

15.   With MBV collapsing, EAC decided to get all the money it could by dunning Paul for payments pursuant to the Guaranty, even though the Guaranty was both fraudulently obtained and part and parcel of an illegal – according to the Federal Trade Commission ("FTC") – enterprise masterminded by EAC and run in concert with its many Dealers, including, while still under Lyle and Hansen's daily control, MBV.

16.   Law enforcement is now going after this EAC-Dealers enterprise.  Thus, the FTC and the Minnesota Attorney General are pushing ahead with a federal complaint for injunctive relief against EAC, Lyle, and Hansen, and the Attorneys General of other States are pursuing their own investigations, including the California Attorney General's presently on-going criminal investigation.

17.   A major federal class action against EAC and its Dealers was recently filed in the Southern District of New York, with the complaint (i) detailing the defendants' illegal enterprise and invoking the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), the federal Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.*, and

other federal and state statutes and (ii) seeking to remedy the injuries of about 60,000

members of the proposed class: "All individuals who have obtained financing from EAC

for student loan assistance services."

18.   In short, EAC, Lyell, and Hansen's harmful conduct toward Paul has been illegal,

deceitful, fraudulent, in breach of fiduciary duties, and conspiratorial, and Paul brings this

civil action to remedy those harms and right those wrongs.

## II.  Parties

19.   Paul resides with his family in Eagle, Ada County, Idaho.

20.   Prime is an Idaho limited liability company, with Paul as its sole member and

manager.

21.   EAC is a Minnesota corporation with its principal place of business in Minnesota.

22.   Both Lyell and Hansen reside in Los Angeles County, California.

## III.  Jurisdiction and Venue

23.   This Court has subject-matter jurisdiction over this civil action pursuant to 28

U.S.C. § 1332(a) because it is between citizens of different States and the amount in

controversy exceeds $75,000.

24.   This Court has specific personal jurisdiction over Lyle and Hansen because their

acts giving rise to Paul's claims asserted in this civil action both fall within the scope of

Idaho's long-arm statute, Idaho Code § 5-514, and satisfy the constitutional standards of

due process.  Specifically, Lyle and Hansen directed misrepresentations and otherwise

tortious communications to Paul in Idaho via electronic means; at all times during the

communications, they knew that Paul was residing in Idaho and realized that the brunt of the injury resulting from their tortious and illegal actions would occur in Idaho; and the injury they caused in fact occurred in Idaho in that Paul paid from Idaho the many hundreds of thousands of dollars that Lyle and Hansen swindled from him.

25.   This Court has general personal jurisdiction over EAC because it is doing business in Idaho and has sufficient contacts with Idaho to permit the exercise of personal jurisdiction.  This Court has specific personal jurisdiction over EAC because its acts giving rise to Paul's claims asserted in this civil action both fall within the scope of Idaho's long-arm statute, Idaho Code § 5-514, and satisfy the constitutional standards of due process.  Specifically, EAC, working in illegal concert with Lyle and Hansen, caused Paul to be duped in Idaho relative to the signing of the Guaranty; EAC knew that Paul was residing in Idaho and realized that the brunt of the injury resulting from its tortious and illegal actions would occur in Idaho; and the injury EAC caused in fact occurred in Idaho in that it is here that EAC's dunning and other aggressive acts relative to the Guaranty are occurring.

26.   Venue is proper in this Court pursuant to (i) 28 U.S.C. § 1391(b)(2) in that it was in this judicial district that a substantial part of the events or omissions giving rise to the claim occurred and (ii) 28 U.S.C. § 1391(b)(3) in that there is no district in which this action may otherwise be brought as provided in 28 U.S.C. § 1391 and each of the Defendants is subject to this Court's personal jurisdiction.

## IV.  The Relevant Facts

**1.  Lyle and Hansen defraud Paul and Prime into buying into the business.**

27.   In October 2015, as Paul was struggling with his wife's health situation and consequently looking for the business opportunity that would be right for him and his family, he came across on the Internet an ad put there by Lyle and Hansen.  A true copy is attached as Exhibit 1 ("Ad").

28.   Paul's response to the Ad led him to Lyle and Hansen's broker, Hoke Nagahori, who sent Paul a sales brochure.  A true copy is attached as Exhibit 2 ("Brochure").

29.   Paul's next step was to speak with Lyle by phone multiple times in the October to December 2015 timeframe ("Phone Calls").

30.   Paul's next step was to meet with Lyle and Hansen in Los Angeles County, California two times during November-December 2015 and hear their in-person pitches ("In-Person Statements").

31.   The Ad, Brochure, Phone Calls, and In-Person Statements are hereafter referred to collectively as the "Sales Pitch."

32.   The Sales Pitch contained multiple representations of fact that were false and material and known to Lyle and Hansen to be false and material and that they made with the intent that Paul rely on them so as to purchase the business they were selling ("Pre-sale Lies").

33.   Because of Lyle and Hansen's skills as fraudsters, Paul was ignorant of the falsity of the Pre-sale Lies; had he known of the falsity of any of the Pre-sale Lies, he would not

have bought into the business; but he through Prime did buy in, justifiably relying on the Pre-sale Lies.

34.   As the direct, proximate, and actual result of the Pre-sale Lies, Paul and Prime have lost many hundreds of thousands of dollars.

35.   The Pre-Sale Lies in the Ad include the statements that:

A.   The new owner could run the business as a "semi-absentee" and the current owners (Lyle and Hansen) "do not work full time and consider the business semi-absentee."  This statement was false, because as Paul learned in the months after buying in, the business had such a never-ending stream of problems related to its business model, operations, vendor relationships, and personnel that it demanded and got Lyle and Hansen's full-time, intense efforts before the sale and required those kinds of efforts after the sale.

B.   The business's "operations have already stabilized."  This statement was false as shown by the fact, among others, that within forty-five days of Paul's buy-in, Lyle and Hansen changed the business model away from only selling cash deals to selling financed deals through EAC.  At that later time, they told Paul that this change would solve the chronic operating cash shortfall resulting from the fact that cash deals cost more to acquire than the initial customer payments were generating, meaning that the business before and after the sale had an operating cash deficiency (a fact which Lyle and Hansen kept hidden from Paul prior to the sale).

C.  "A disagreement between partners [Lyle and Hansen] regarding strategic direction forces sale."  This statement was false.  Lyle and Hansen's motive, jointly shared, for selling was to put into their own pockets a large amount of cash in exchange for a troubled company that they knew had little genuine value.

36.   The Pre-sale Lies in the Brochure include each of the statements set forth in the immediately preceding paragraph and the additional statements that:

A. The client entered into an agreement with the business to pay "$39 per month for the duration of the [federal student] loan (typically 10 years)."  This was false because the client's obligation to the business for that monthly fee could be terminated at will at any time and, in any event, was for a term far less than ten years and, indeed, had to be renewed every year.

B. The business's only licensing requirement was a "city business license."  This was false because the business was operating in forty-six states and therefore needed business licenses in many or most of those states, including Minnesota, but had none.

C. The business had 16 persons doing sales and only sales.  This was false because a substantial portion of those persons devoted substantial time to customer retention and annual renewal work.

D. Even if the business stopped doing business, its "Residual Income could continue for years" (ten years being repeatedly mentioned).  This is false because, if the

business stopped, there would be no customer retention and annual renewal work done, hence no annual renewal, and hence no Residual Income.

37.   The Pre-sale Lies in the Phone Calls and In-Person Statements include each of the statements set forth in the immediately two preceding paragraphs and the additional statements that:

A. The business was compliant with the law and this compliance had been confirmed to Lyle and Hansen by industry-leading lawyers.  This was false because the business was not compliant with the law in that, at least, (i) it had failed to receive required licenses, (ii) because it was pocketing a client's money before the client received the promised services, in violation, according to the FTC, of the Telemarketing Sales Rule, and (iii) its salespersons, according to the FTC, were engaged in misrepresentations and other deceptive practices in violation of various federal statutes and regulations – and no competent lawyer aware of the business's operations would have said otherwise.

B. The script used by the business's salespersons had been reviewed and approved by a competent lawyer.  This was false because those salespersons were using business-provided scripts that were violative of the law – and no competent lawyer aware of those scripts would have said otherwise.

C. The business was very profitable over the previous months, to the tune of many tens of thousands of dollars in net profits.  This was false because the business was troubled and actually losing money.

COMPLAINT AND DEMAND FOR JURY TRIAL – PG. 11

38.   Lyle and Hansen also used material omissions in inducing Paul and Prime to invest in the business ("Pre-sale Omissions").  The Pre-sale Omissions included the failure and refusal to disclose the material facts that:

    A.  The business was dependent upon annual renewals from its clients in order to sustain a revenue stream.

    B.  The business was dependent upon constant, intense customer retention efforts in the face of a high-level of intended and/or actual cancellations.

    C.  The business had to devote a substantial part of its resources to the annual renewal and customer retention work in order to stay afloat.

    D.  The business required frequent infusions of tens of thousands of dollars to stay afloat month to month.

39.   The Pre-sale Omissions rendered the Sales Pitch doubly deceitful, misleading, and fraudulent and, in the circumstances, Lyle and Hansen owed Paul and Prime a duty to timely disclose the omitted facts.  Had Paul known of the omitted facts, he and Prime would not have invested in the business.

40.   Paul and Prime bought into the business by transferring $850,000 to Lyle and Hansen's entity South Bay Investments, LLC ("SBI"), which was the alter ego of Lyle and Hansen.  Lyle and Hansen then had SBI transfer all the assets of the business that was the subject of the Sales Pitch (except account receivables and pre-existing residual income) into MBV, with Prime receiving an 85% membership interest and each of Lyle

and Hansen receiving a 7.5% membership interest and, between them, a contractual right

to 10% of MBV's gross profits for the next thirty-six months.

**2. Post-sale, Lyle and Hansen defraud Paul and Prime out of hundreds of thousands of dollars more and fraudulently put Paul at great risk relative to EAC.**

41.  After the sale, Lyle and Hansen used multiple false statements ("Post-sale Lies") and

material omissions ("Post-sale Omissions") to induce Paul to pour into the business

through Prime many more hundreds of thousands of dollars of his own money ("Post-sale

Money") and to sign EAC documents designed to get even more money into the business,

all with the purpose and effect of enabling Lyle and Hansen to loot the business of

hundreds of thousands of dollars for their own personal enrichment.

42.  The Post-sale Lies consisted of multiple representations of fact that were false and

material and known to Lyle and Hansen to be false and material and that they made with

the intent that Paul rely on them so as to send them the Post-sale Money and to sign the

EAC documents.

43.  Because of Lyle and Hansen's skills as fraudsters, Paul was ignorant of the falsity of

the Post-sale Lies; had he known of the falsity of any of the Post-sale Lies, he would not

have sent the Post-sale Money or signed the EAC documents; but he did do that,

justifiably relying on the Post-sale Lies.

44.  As the direct, proximate, and actual result of the Post-sale Lies and Post-sale

Omissions, Paul and Prime have lost many hundreds of thousands of dollars and Paul is

at risk of losing many hundreds of thousands of dollars more.

45.  The Post-sale Lies included repetitions of the Pre-sale Lies and the additional statements that:

A.  The post-sale operations of MBV, including the training and performance of its salespeople, were compliant with the law, and industry-leading lawyers were periodically reviewing those operations to assure that ongoing compliance.  These statements included statements that MBV had state-of-the-art recording and similar equipment and software enabling Lyle and Hansen to monitor the salespeople's performance so as to insure full compliance with the law and that Lyle and Hansen were in fact using that equipment and software regularly for that purpose.  The statements about compliance and industry-leading lawyers were false because the business was not compliant with the law in that, at least, (i) it had failed to receive required licenses, (ii) because it was pocketing a client's money before the client received the promised services, in violation, according to the FTC, of the Telemarketing Sales Rule, and (iii) its salespersons, according to the FTC, were engaged in misrepresentations and other deceptive practices in violation of various federal statutes and regulations – and no competent lawyer aware of the business's operations would have said otherwise.  The statements regarding recording and monitory equipment and actual monitoring were false as pure fantasy.

B.  MBV's cash flow enabled it to repay Paul and Prime within a few weeks of each of the infusions of Post-sale Money that Lyle and Hansen regularly asked for and

got. This statement was false because the cash flow was grossly inadequate to cover those infusions both because the total other money into the business was not enough to cover its operations and because Lyle and Hansen were looting the company by wrongfully and secretly taking for themselves many hundreds of thousands of dollars of the money the business was receiving.

46. The Post-sale Lies also included each of the statements specified in Section IV, Part 4 below, which involved the Dealer Agreement and the Guaranty (collectively "EAC Documents").

47. Lyle and Hansen also used material omissions to induce Paul and Prime to send them the Post-sale Money and to induce Paul to sign the EAC Documents ("Post-sale Omissions"). The Post-sale Omissions included the Pre-sale Omissions and the failure and refusal to disclose the additional material facts that:

A. Lyle and Hansen were secretly skimming 10% of the money coming into the business, under the guise of that money constituting "gross profits."

B. The business was not generating and was incapable of generating a cash flow adequate to meet its expenses.

C. The Dealer Agreement created massive obligations on the part of MBV, and the Guaranty purported to put Paul personally on the hook for those massive obligations.

48. The Post-sale Omissions rendered the Post-sale Lies doubly deceitful, misleading, and fraudulent and, in the circumstances, Lyle and Hansen owed Paul and Prime a duty to

timely disclose the omitted facts.  Had Paul known of any of the omitted facts, he and

Prime would not have sent the Post-sale Money and Paul would not have signed the EAC

Documents.

### 3.  EAC, Lyle, and Hansen get together in an illegal enterprise.

49.    Within weeks of getting the Plaintiffs' $850,000, Lyle and Hansen got together with

EAC in an illegal enterprise masterminded by EAC ("Scheme").

50.    The Scheme masterminded by EAC depends on the coordinated efforts of EAC and

its individual Dealers, numbering about forty-three across the Nation.

51.    As a general pattern, the Dealers lure vulnerable federal student loan borrowers with

misleading promises of so-called loan "forgiveness," lower interest rates, and other

supposed benefits relative to the borrowers' student loans.

52.    At EAC's direction, the Dealers sell "services" of little or no value for about $1,300.

Because few borrowers can afford that sum up-front, the Dealers purport to offer a

"payment plan" of around $39 to $49 per month.  But the Dealers do not, in fact, offer

any payment plan.  Instead, they steer the borrowers to EAC to provide funding to

complete the sale.

53.    EAC extends each borrower it signs up ("Borrower") *an entirely new loan*, in the

form of a maxed-out "line of credit" for the full price of the services. The total cost is

amortized over multiple years, with an annual interest rate of almost 21%—with the

effect that Borrowers end up owing EAC hundreds of dollars more than the already-

inflated purchase price.  EAC secures Borrowers' agreement to these usurious terms by

deliberately and illegally disguising the nature and true cost of the credit it is extending.

54.    Specifically, the purpose of the Truth in Lending Act is to "assure a meaningful disclosure

of credit terms so that the consumer will be able to compare more readily the various credit terms

available to him and avoid the uninformed use of credit, and to protect the consumer against

inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).  In the course

of extending credit to the Borrowers, EAC has violated and continues to violate the requirements

of that Act and its Regulation Z by failing to clearly and conspicuously disclose in writing the

following information so that the Borrowers can make an informed decision regarding the credit

being offered:

- the identity of the creditor making the disclosures;

- the amount financed ("using that term and a brief description such as

- 'the amount of credit provided to you on your behalf'");

- the finance charge ("using that term, and a brief description such as 'the dollar amount the credit will cost you'");

- the annual percentage rate ("using that term, and a brief description such as 'the cost of your credit as a yearly rate'");

- the payment schedule ("the number, amounts and timing of payments scheduled to repay the obligation"); and

- the total of payments ("using that term, and a descriptive explanation

- . . . such as 'the total price of your purchase on credit'").

Further, in making the loans to the Borrowers, EAC has violated and continues to violate various

state disclosure laws.

55.   For each Borrower that a Dealer sends to EAC, EAC sends to that Dealer an amount equal to a large portion of the principal amount of the Borrower's EAC loan ("Funds"), with EAC at the same time booking the amount equal to the remaining portion into that Dealer's "reserve account."  The Funds are an EAC loan or prepayment to the Dealer that is dependent on continued payments from the Borrower; that is, when the Borrower ceases to pay on its EAC loan (which happens frequently), based on its Dealer Agreement EAC demands repayment from the Dealer.  In this way, EAC gets its Dealers, including MBV, hooked on a steady flow of Funds so that the Dealers have to continue to send to EAC many prospective Borrowers.  If a Dealer ceases to do that, EAC begins dunning that Dealer (and any person guaranteeing the Dealer's performance under the Dealer Agreement) as soon as the Dealer's reserve account is depleted.

56.   The Dealers enroll Borrowers in programs available for free.  Although Paul does not know the extent of MBV's actions in this context, it appears that, generally speaking, the Dealers sometimes falsely and unlawfully impersonate the Borrower in the enrollment process and also often take steps (some irrevocable) that effectively raise the Borrowers' student loan interest rates, balances, repayment terms, or all of the above.  If and when Borrowers realize what has happened, EAC blames the Dealers for the purported services but continues to extract payments on its own loan with the threat of negative credit reporting.

57.   The Scheme depends on the coordinated efforts of both EAC and the Dealers, which must engage in concerted unlawful activity for the Scheme to succeed.  EAC needs the

COMPLAINT AND DEMAND FOR JURY TRIAL – p. 18

Dealers to misrepresent the services they sell, or else no Borrower would agree to buy them and need EAC's financing.  The Dealers, meanwhile, need EAC's financing to get the otherwise unattainable up-front payments that fund their operations.  (Because Paul was not involved in the daily operations of MBV, he has no personal knowledge of the extent to which, under Lyle and Hansen's direction and control, MBV employees, in communicating with prospective Borrowers, made truthful or misleading statements or material omissions.  Paul is now aware that the FTC and the Minnesota Attorney General are asserting that during that time those employees in their sales pitches made materially misleading statements and material omissions and that MBV's operations included other violations of law.)

58.    Because of the high default rate on the Borrowers' EAC loans and because of how EAC built its Scheme, including the onerous terms of the Dealer Agreement, the existence of any connected Personal Guaranty, and the mechanisms hooking the Dealers on a constant flow to them of Funds, it appears that the Scheme for most or all of the Dealers has been a financial bust, while at the same time generating large profits for EAC.

59.    EAC's Scheme is illegal, and that understanding is spreading rapidly. Many hundreds of Borrowers have complained about EAC's practices to the Better Business Bureau and Consumer Financial Protection Bureau.  EAC and various Dealers have been sued multiple times over their practices, including the recently filed federal class action, *Williams v. Equitable Acceptance Corporation*, Case 1:18-cv-07537 (S.D.N.Y. Aug. 17,

2018), where the Complaint ("Class Action Complaint") describes in extraordinary detail and specificity the Scheme and its illegality. And, as noted above, multiple state and federal regulators and law enforcement officers are investigating EAC in both the civil and criminal context. EAC has nonetheless continued its practices unabated.

**4. As part and in furtherance of their illegal enterprise with EAC and with EAC's involvement, Lyle and Hansen dupe Paul into signing the Guaranty and Dealer Agreement without him understanding their nature, scope, and import.**

60.     When, without Paul's knowledge, Lyle and Hansen got together with EAC and agreed to make MBV a Dealer in the Scheme, the ever greedy EAC demanded a sweetener to enter into its deal with those two – Paul's personal guarantee of all the massive and onerous MBV obligations set forth in the Dealer Agreement.

61.     EAC's demand posed a dilemma for Lyle and Hansen. They had not informed Paul of their dealings and intentions with EAC, of the nature of the Dealer Agreement, or of any other aspect of the Scheme because they knew that Paul, if fairly informed, would not go along. Yet EAC made clear to Lyle and Hansen that they had to get Paul's signature on both the Guaranty and the Dealer Agreement in order to get into MBV the large Funds the Scheme would put there. Lyle and Hansen wanted the Funds there so they could loot that money.

62.     Lyle and Hansen decided on a fraud/rush scheme. On the morning of Monday, January 11, 2016, Lyle called Paul, communicated that MBV needed Paul to sign immediately a couple of unimportant, ordinary business documents, by material misrepresentations and omissions got Paul to understand that the documents were in the

nature of something like a credit card application, insisted on the need for immediate action, said that Paul in his return email needed to say "I've read these and understand them," and extracted from Paul a promise of immediate turn-around. Paul gave that promise because of the trust and confidence which Lyle and Hansen had so carefully cultivated in Paul over the previous weeks.

63.   The Dealer Agreement and Guaranty were attachments to an email that Lyle had received from EAC agent Hunt; Lyle forwarded it to Paul at his Eagle office at 11:38 a.m. Lyle's email said nothing about those two documents and Hunt's email said about them only: "[T]he other documents need to be signed and emailed back to me. The originals also need to be emailed to Equitable direct."

64.   Paul immediately printed out the documents and sent Lyle an 12:18 p.m. email saying: "I'm headed to bank for notary. I'll have notarized docs back to you in 30 minutes." Paul then went to a local bank, signed the documents and had them notarized, returned to his Eagle office, scanned the documents, attached them to a 2:00 p.m. email to Lyle, and mailed the originals to EAC as directed. Because of Lyle and Hansen's fraud/rush scheme, Paul did not understand the nature, scope, or purported effects of the two key documents, particularly the lengthy, complex Dealer Agreement.

65.   Paul never gave those "ordinary" documents another thought until many months later when, as problems mounted at MBV through Lyle and Hansen's mismanagement and secret looting and Lyle and Hansen kept calling upon Paul for ever more money to

keep the business going, those two finally disclosed to Paul the true nature of the Dealer Agreement and the Guaranty.  This disclosure made Paul sick to his stomach.

**5.  Lyle and Hansen loot MBV.**

66.   With the "success" of the fraud/rush scheme, Lyle and Hansen got MBV going as part of the EAC Scheme.  As stated above, because Paul was not involved in the daily operations of MBV, he has no personal knowledge of the extent to which, under Lyle and Hansen's direction and control, MBV employees, in communicating with prospective Borrowers, made truthful or misleading statements or material omissions, but Paul is now aware that the FTC and the Minnesota Attorney General's assertions about MBV.  Back then (2016-2017), however, Lyle and Hansen were stating to Paul that MBV in its operations, including its sales operations, was fully compliant with all applicable laws.  Paul believed those statements and did so reasonably in light of all the circumstances then obtaining.

67.   With Lyle and Hansen spurring on the MBV employees, MBV sent many people to EAC, which in turn made them Borrowers.  EAC then sent on to MBV Funds totally over time over $4 million.

68.   Lyle and Hansen wasted no time taking a substantial portion of the Funds for themselves and using it to extend their extravagant lifestyle, with home, car, exotic vacation, and other purchases.  They took about 10% of the total under the guise of the Funds constituting "gross profit."  The Funds, however, were a loan to MBV, or at least a

prepayment burdened by onerous repayment obligations, so the Funds did even constitute revenue to MBV, let alone gross profits.

69.   Lyle and Hansen never disclosed to Paul that they were taking this money to themselves.  Only after the collapse of MBV, when Paul sent in an accountant to try to recreate the books so MBV could file honest tax returns, did Paul learn of the looting.  That was in the fall of 2017.

70.   This particular "non-disclosure" was part of a larger pattern where Lyle and Hansen would not make to Paul disclosures about the business.  Paul repeatedly asked them to send him financial, banking, and accounting records and other reports and documents on MBV's operations, but those two consistently evaded and otherwise failed and refused to meet those requests.  Rather, they did with MBV as they desired while keeping Paul largely in the dark by way of misrepresentations, material omissions, and failures to disclose.

71.   By the fall of 2017, Lyle and Hansen by their mismanagement and looting of MBV had driven it into the ground and therefore announced that they were going to abandon the business and walk away, leaving Paul to deal with the mess.  Soon thereafter, however, they learned that the FTC had opened an investigation of them and MBV, so as a self-protective measure they decided to stay with the company.  Paul, at his own very considerable expense, had MBV cooperate fully with the FTC investigation.

72.   Paul also had to pay substantial sums to meet MBV's various business and payment obligations, such as rent and resolution of disputes with employees.  Despite Paul's

repeated requests of them to contribute their proportionate share of those expenses, Lyle and Hansen failed and refused to do so, leaving virtually the entire financial burden on Paul and thereby causing him the loss of many more hundreds of thousands of dollars.

73.   The FTC investigation, joined by the Minnesota Attorney General, has resulted to date in a draft Complaint against EAC, Lyle, Hansen, and MBV alleging violations of federal statutes and regulations and Minnesota statutes and regulations and seeking injunctions, rescission or reformation of contracts, restitution, refund, disgorgement, and other equitable relief ("FTC Draft Complaint").

**6.  EAC duns Paul for payments pursuant to the Guaranty, even though it was both fraudulently obtained and part and parcel of an illegal enterprise masterminded by EAC.**

74.   Prior to delivery to it of the FTC Draft Complaint, EAC never made a demand on Paul for any payment, but after that delivery EAC began a program of dunning Paul for payment to it of substantial sums supposedly owed by MBV under the Dealer Agreement.

75.   In rolling out this dunning program, EAC is engaging in its standard ploy when called to account for the harm caused by the EAC-masterminded Scheme:  it points its finger at the Dealers and blames them for any illegality, while posing as the innocent, unaware, good-faith lender that did only honest, legal, arms-length loan transactions with the Borrowers.

76.   EAC's pose is false and its ploy is deceitful.

77.   Paul has paid and has a reasonable need to continue paying substantial sums to protect himself against EAC relative to the Guaranty.

COMPLAINT AND DEMAND FOR JURY TRIAL – p. 24

**7. Further allegations.**

78.   In doing what is set forth above, Lyle and Hansen acted as co-conspirators.

79.   In doing what is set forth above in Section IV, Parts 3-5, EAC, Lyle, and Hansen

acted as co-conspirators.

80.   At the appropriate time in their prosecution of this civil action, the Plaintiffs will

move for leave to amend this Complaint for the purpose of adding a claim for punitive

damages, pursuant to Idaho Code § 6-1604.

81.   All allegations set forth in this Complaint are incorporated into and made a part of

each of the following claims.

## V.  Claims

## Claim for Fraud

82.   Lyle and Hansen caused to be made the Pre-sale Lies and the Post-sale Lies, and

also were responsible for the Pre-sale Omissions and the Post-sale Omissions, all as set

forth in detail in Section IV, Parts 1-2 above (collectively "Lies and Omissions").

83.   Also as set forth in detail in Section IV, Parts 1-2 above, the Lies and Omissions

were false and done with the intent to deceive Paul and Prime and were known to Lyle

and Hansen to be false and deceitful.

84.   The Lies and Omissions were material in that, but for each of them, Paul and Prime

would not have bought into the business or sent the Post-sale Money and Paul would not

have signed the EAC Documents.

85. Lyle and Hansen made the Lies and Omissions with the intent that Paul and Prime rely on them, which Paul and Prime justifiably did in ignorance of the falsity and deceit.

86. With respect to the Pre-sale Omissions and the Post-sale Omissions, each of the omissions constitutes fraud because Lyle and Hansen had a duty to disclose to Paul and Prime the omitted facts. Lyle and Hansen had that duty to disclose because of each of three independently adequate realities: (i) Lyle and Hansen had a fiduciary relationship with Paul and Prime, as specified in the Claim for Breach of Fiduciary Duties below; (ii) Lyle and Hansen gave to Paul and Prime partial statements of the facts that, in the absence of disclosure of the omitted facts, were misleading; and (iii) the omitted facts, which were known to Lyle and Hansen (and which they knew Paul and Prime did not know), were such that, if not known to Lyle and Hansen, would render the resulting agreements voidable under the doctrine of mutual mistake.

87. As the direct, proximate, and actual result of the Lies and Omissions, Paul and Prime have lost many hundreds of thousands of dollars and Paul signed the EAC Documents, thereby putting him at substantial risk of more substantial loss.

## Claim for Breach of Fiduciary Duties

88. For their own gain, Lyle and Hansen set out to induce Paul to trust them and repose his confidence in them. In that endeavor, they succeeded, thereby creating a relationship imposing fiduciary duties on them in favor of Paul and Prime.

89. Moreover, Lyle and Hansen were each a member of MBV, as was Prime, and those two were also officers and executives of that company, certainly *de facto* if not otherwise.

The size and nature of MBV and the respective roles of Paul, Prime, Lyle, and Hansen relative to it also gave rise to a relationship imposing fiduciary duties on Lyle and Hansen in favor of Paul and Prime.

90.   The fiduciary duties owed by Lyle and Hansen to Paul and Prime included duties of undivided loyalty, scrupulous honesty, and high care, meaning that many forms of conduct permissible in a workaday world for those acting at arm's length were forbidden to Lyle and Hansen, exactly because they were bound by fiduciary ties.  In their roles relative to Paul and Prime, Lyle and Hansen were obligated to meet a standard stricter than the morals of the market place. Not honesty alone but the punctilio of an honor the most sensitive was the law-imposed standard for their behavior. Their fiduciary duties meant that they must not put themselves in a relationship where their interests became antagonistic to those of Paul and Prime, that they must work with an eye single to the interests of Paul and Prime, and that they must be scrupulously honest and straight-forward with Paul and Prime in all their dealings.

91.   Lyle and Hansen breached their fiduciary duties owed to Paul and Prime by:

   A.   engaging in and perpetrating the fraud and deceit specified in the previous Claim;

   B.   engaging in the fraudulent, deceitful, and self-serving conduct relative to the EAC Documents, as specified in Section IV, Part 4 above;

   C.   looting MBV, as specified in Section IV, Part 5 above;

   D.   failing and refusing to (i) provide business, financial, and banking information and other business-related reports and documents to Paul and Prime, despite being

repeatedly asked to do so, as specified in Section IV, Part 5 above, and (ii) be honest and forthcoming with Paul about the Scheme and MBV's involvement in it;

E.   failing and refusing to comply with Paul's early and repeated directions that they cease using Lyle and Hansen's misleading d/b/a for the business, The Student Loan Relief Department;

F.   failing and refusing to fulfill their payment and contribution obligations relative to MBV, thereby leaving the financial burden on Paul and Prime alone, as specified in Section IV, Part 5 above; and

G.   running MBV into the ground through business conduct that fell well below the standard of care they were obligated to meet.

92.   As the direct, proximate, and actual result of Lyle and Hansen's breaches of their fiduciary duties, Paul and Prime have lost many hundreds of thousands of dollars and are at risk of losing much more.

### Claim for Civil Wrongs Committed as Objectives of Conspiracy

93.   By mutual agreement, including conscious concert of action ("Agreement"), EAC, Lyle, and Hansen entered into a civil conspiracy to achieve certain unlawful objectives and/or to achieve certain lawful objectives by unlawful means ("Conspiracy").  The Conspiracy's objectives constitute certain civil wrongs that are hereafter referred to as the "Wrongs."  EAC, Lyle, and Hansen are co-conspirators of the Conspiracy.

94.   The Agreement and Conspiracy began about December 2015 when EAC, Lyle, and Hansen got together to discuss and then agree to their mutual involvement in the EAC-

masterminded Scheme, with that Scheme being specifically described in Section IV, Part 3 above and in the FTC Draft Complaint and the Class Action Complaint, both of which the Defendants have.

95.    One of the key provisions of the Agreement and objectives of the Conspiracy with the purpose and effect of injuring Paul and Prime was getting Paul to sign the Dealer Agreement and the Guaranty.  Getting his signature constituted one of the Wrongs because Lyle and Hansen, as co-conspirators and in furtherance of the Conspiracy, achieved that objective by means of fraud, deceit, and breach of fiduciary duties, as specified in Section IV, Part 4 above and in the Claim for Breach of Fiduciary Duties above.

96.    Another key provision of the Agreement and objective of the Conspiracy with the purpose and effect of injuring Paul and Prime was having MBV continue actively engaged in the Scheme as a Dealer during 2016 and into 2017.  Keeping MBV in the game was an important objective of the Conspiracy and constituted one of the Wrongs.  It was a Wrong because Lyle and Hansen, as co-conspirators and in furtherance of the Conspiracy, achieved that objective by means of breach of fiduciary duties, specifically, (i) Lyle and Hansen's use of the Post-sale Lies and the Post-sale Omissions, (ii) their failure and refusal to provide business, financial, and banking information and other business-related reports and documents to Paul and Prime, despite being repeatedly asked to do so, and (iii) their failure and refusal to be honest and forth-coming with Paul about the Scheme and MBV's involvement in it, all as specified above.  The co-conspirators

knew that if Paul knew of the Scheme and MBV's involvement in it, he would end that involvement; hence, they breached fiduciary duties to achieve important objectives of the Conspiracy.

97.   Regarding the allegations in the FTC Draft Complaint about MBV employees resorting to misrepresentations and omissions in their sales pitches and other unlawful MBV activities, Paul and Prime do not know and have no reasonable way of knowing the accuracy of those allegations.  But if those allegations are accurate, it means that Lyle and Hansen further breached their fiduciary duty of due care by allowing and/or encouraging that employee misconduct and by causing and/or allowing the other MBV misconduct.  Lyle and Hansen would have committed that breach to achieve the Conspiracy's objective of having MBV send many prospective Borrowers on to EAC. This breach would be a further Wrong injurious to Paul and Prime.

98.   As the direct, proximate, and actual result of the Conspiracy, Paul and Prime have lost many hundreds of thousands of dollars, including the money spent in ignorance to keep MBV active in the Scheme, the money necessarily spent on MBV's involvement in the FTC investigation, and the money spent and yet to be spent to protect Paul against EAC's actions in using against him the Guaranty – which was gotten by fraud, deceit, breach of fiduciary duties, and conspiracy and is, as part and parcel of the large illegal Scheme, void and unenforceable for illegality.

99.   EAC, Lyle, and Hansen, as co-conspirators, are jointly and severally liable for the damages just specified.

## **Claim for Declaratory Judgment**

100. An actual controversy exists between Paul and EAC over the Guaranty.

101. Paul asserts that the Guaranty is void and unenforceable under the doctrine of illegality. That is so:

    A. because the Guaranty was gotten by fraud, deceit, breach of fiduciary duties, and conspiracy, as specified above;

    B. because the Guaranty purports to "guarantee to EAC the full and prompt performance and compliance, including but not limited to payment, with all liabilities and obligations of [MBV as] Dealer as described in the" Dealer Agreement, yet the Dealer Agreement is part and parcel of and a key tool and device in the illegal Scheme, as specified above;

    C. because an agreement (Guaranty) guaranteeing performance of an illegal contract (Dealer Agreement) is itself illegal; and

    D. because as an illegal contract the Guaranty is void *ab initio*, and the law will enforce no part of it.

102. EAC denies Paul's assertions and asserts that the Guaranty is valid and enforceable against him.

103. The Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, authorizes this Court to declare the rights and other legal relations of Paul and EAC relative to this actual controversy and to give that declaration the force and effect of a final judgment. This Court should do so.

## VI.  Prayer

In light of all the foregoing, the Plaintiffs pray that this Court enter a final judgment against the Defendants that awards the Plaintiffs:

A.    the full amount of the damages caused the Plaintiffs by the Defendants' wrongful conduct;

B.    additionally, the full amount of Plaintiffs' costs and attorneys' fees incurred in the prosecution of this civil action;

C.    additionally, upon allowance to amend this Complaint pursuant to Idaho Code § 6-1604, a further money award in accord with that statute;

D.    a declaration that the Guaranty cannot be enforced; and

E.    such other relief and remedies as are just and equitable in the circumstances.

## DEMAND FOR JURY TRIAL

The Plaintiffs demand trial by jury on all claims, defenses, and issues.

Date:  January 28, 2019.

Monte Neil Stewart (ISB # 8129)
WRIGHT MARSH AND LEVY
and
Daniel W. Bower (ISB # 7204)
MORRIS BOWER & HAWS PLLC


 _/s/  Daniel W. Bower_
By: Daniel W. Bower

*Lawyers for the Plaintiffs*
